UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | CASE NO. 1:05-CR-31 |
| ) | |
| JERMAINE C. WHITSETT ) | |
| ) | |
| Defendant. ) | |

OPINION AND ORDER

This matter is before the Court on a "Motion to Suppress Evidence" filed by the Defendant Jermaine C. Whitsett ("Whitsett") on July 7, 2005. On August 18, 2005, the Court held an evidentiary hearing and took the motion under advisement awaiting briefs from the parties. Defendant filed his supporting brief on October 3, 2005 to which the Government responded on November 2, 2005. Defendant replied on November 10, 2005. For the following reasons, the Defendant's Motion to Suppress will be DENIED.

**FACTUAL BACKGROUND**

Whitsett is charged in a two count indictment with violations of 21 U.S.C. §844 (possession of cocaine base crack) and 18 U.S.C. §922(g)(1) (felon in possession of a firearm). This indictment followed Whitsett's arrest on February 13, 2005 for possession of stolen property, possession of a firearm without a license, and public intoxication. The present motion to suppress relates to the search of Whitsett's person prior to this arrest and the events which followed therefrom with Whitsett contending that police illegally seized physical evidence and that statements made by him to officers both at the scene and afterward were procured in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). The facts surrounding Whitsett's arrest are as follows:

At approximately 1:59 a.m. on February 13, 2005, Fort Wayne Police Officer Troy Jester ("Officer Jester") was dispatched to the corner of Berry and Calhoun Streets to investigate a moving disturbance call. The disturbance call came from a female who was calling on her cellular telephone to report that there was a man inside her vehicle who was refusing to get out. The caller further advised the dispatcher of her location and indicated that she had her vehicle emergency flashers activated.

Within a minute after the dispatch aired, Officer Jester arrived on the scene in a fully marked squad car. Officer Jester located the vehicle stopped at the intersection of Berry and Calhoun Streets with its emergency flashers activated. Officer Jester pulled his squad car behind the vehicle and activated his own emergency lights. From this point until Whitsett is transported from the scene, the events are captured on videotape via Officer Jester's in-car video camera. Both the testimony of Officer Jester and the videotape confirm that Officer Jester approached the right rear passenger side of the car and asked the occupant, Whitsett, to step out of the car. Officer Jester testified that when he looked into the window, Whitsett was "hunched over" inside the vehicle and he could not see his hands. As Whitsett stepped from the vehicle to comply with Officer Jester's request, he attempted to place his hands in his pockets and was instructed by Officer Jester not to do that. When Whitsett stepped out of the vehicle, Officer Jester smelled a strong odor of alcohol exuding from Whitsett. Officer Jester also observed Whitsett swaying slightly, slurring his speech and noted that he was wearing sunglasses at 2:00 a.m. Officer Jester testified about the encounter as follows:

> I asked him to step out of the car when I –
>     I had to knock on the window because the window was still up. I noticed he was kind of hunched over. He had his hands between his legs. I couldn't see his hands. And I wanted him to exit the vehicle anyway to speak to me.
>     As soon as he exited the vehicle, he started to put his hands into his pockets. At that time is when I really could smell a strong smell of an alcoholic beverage

> coming from him. And with his actions, trying to put his hands in his pockets, not being able to see his hands when I first walked up to the car, I went ahead and placed him in handcuffs and brought him to the back of the car, and I told him he was [not] under arrest at that time.[1]

(Transcript, at pp. 12-13). Although he handcuffed Whitsett, Officer Jester testified that he did not intend, at that time, to place Whitsett under arrest for public intoxication.

Officer Jester then requested identification, which Whitsett produced. As other officers, including Officer Greg Woods ("Officer Woods"), arrived on the scene, Officer Jester returned to his squad car with Whitsett's identification to do a routine warrants check. Officer Jester told Officer Woods that he had not done a complete pat down of Whitsett. In response to Officer Jester's comment, the videotape shows Officer Woods conducting what he testified to be a "pat down" search of Whitsett. Officer Woods is shown manipulating and squeezing the outer pockets of Whitsett's jacket and immediately placing his hand inside the pockets. During the search, Officer Woods retrieved a bullet from inside Whitsett's right pants pocket. A total of six bullets were eventually found in the right pants pocket.

When shown the videotaped footage during his testimony and asked about his exploration of the outer pockets of Whitsett's jacket, Officer Woods testified that he was "just crushing" the pockets. (Tr. at 71). As for what caused him to search Whitsett's pockets, Officer Woods testified as follows:

> Q.: What did you feel that caused you to go into his pocket at that point?
> A.: I couldn't – I don't know. At that point I felt something. I probably asked him what it was and he probably told he didn't know...
>
> Q: What object did you feel on his left side that caused you to go into his

---

[1] The parties agree that the word "not" was mistakenly omitted from the transcript at p. 13, line 10 and that Officer Jester testified that he told Whitsett he was *not* under arrest.

3

| | |
|---|---|
| | pocket? |
| A: | I don't know, sir. |
| Q: | And Officer, I just want to make sure I've got it.  Your testimony is you don't remember what it was that you felt in his right jacket pocket or his left jacket pocket or his left pants pocket that caused you to go into those pockets, but you do recall on the right pants pocket you felt a round, hard circular object? |
| A: | Through the jacket pockets I did feel something in the pockets.  I asked him – I probably asked him what it was.  Being[] that it wasn't anything to endanger anybody, I didn't document it.. |
| | As to the left pocket of the pants, I don't believe I went into that pocket. |
| Q: | Okay |
| A: | But to the right side of his pants, yes, I did feel what I felt was a bullet |

Officer Woods also testified that if Whitsett had asked to leave the scene prior to the pat down, he would not have been free to leave.

While Officer Woods conducted the search of Whitsett, other officers were standing near the doors of the stopped vehicle, observing its remaining occupants while they remained seated in the car.  After recovering the first bullet from Whitsett's pocket, Officer Woods told the other officers that he had retrieved a bullet.  Officer Scott Straub ("Officer Straub") overheard Officer Woods talking about finding ammunition and looked through the passenger side rear window next to where he had been observing the vehicle.  Officer Straub then observed the handle of a gun against the back seat and the muzzle of a .38 caliber Smith and Wesson on the floor board propped against the seat where Whitsett had been seated.

Within a few minutes, Officer Jester returned with information that Whitsett had a prior record for handgun violations and cocaine.  A check of the serial number on the gun indicated that the gun was stolen.  All the while, Whitsett remained handcuffed at the rear of the vehicle.  It is undisputed at this point that Whitsett was under arrest.

At some point, Officer Donald Lewis ("Officer Lewis") administered a portable breath test

("PBT") to Whitsett. It is undisputed that Whitsett had a blood alcohol content of in excess of .30 which far exceeds the legal limit for driving of .08 in Indiana. Officer Lewis then placed Whitsett in the back of his squad car to transport him to the hospital for observation until his blood alcohol level subsided.[2] While in the squad car, Officer Lewis read Whitsett his *Miranda* warnings and, according to Officer Lewis, Whitsett responded affirmatively to each right read to him:

> When I read it off the card, after each phrase I stop and asked if he understood and he indicated yes, he did. So he would have indicated "yes" approximately five times.

(Tr. at 51).

The exact time that elapsed between Whitsett's transport from the scene of the stop to the hospital and subsequently to the jail was not accurately established in the evidence. Nonetheless, at some point within a few hours of the stop, Whitsett was transported from the hospital to the Allen County Jail. During a search incident to his arrest, Officer Lewis recovered a white chunk substance wrapped in a plastic bag from a pocket of Whitsett's jeans. The substance tested positive for cocaine with a bag weight of approximately 3.7 grams. In addition, four more rounds of .38 caliber ammunition were located in the defendant's jacket.

When Officer Lewis recovered the cocaine from Whitsett's jeans, Whitsett began asking Officer Lewis for a piece of the cocaine:

> He literally begged me for a piece of the cocaine. He indicated that he had a problem and begged me to break off a small piece so that he could consume it prior to entering the jail. The initial – when I initially recovered the cocaine from his pocket it was a deeper yellow than I normally see on the street. I made the comment that it might be soap. At that point he indicated that, 'Yeah, it was soap.'
> And I got the impression he thought I was trying to cut him a break at that

---

[2]The Allen County lock-up does not accept individuals whose blood alcohol content ("BAC")is above .25 due to the risk of a medical issue such as alcohol poisoning arising from a high level of intoxication. Whitsett's BAC exceeded the maximum level and thus, officers were required to transport him to the hospital to "dry out."

> point.  And he jumped on the fact that I thought it was soap.  He says, 'Yeah, that's just fake stuff.  That's soap.'
> But then I had it field tested in the sally port by another officer and it did test positive for cocaine.  And he repeatedly begged me for a piece of cocaine.

(Tr. at 53-54).  During this exchange, Whitsett also indicated that he had "screwed up."  (Tr. at 61).  According to Officer Lewis, he did not ask Whitsett any questions prior to this exchange. Further, Officer Lewis stated that he believed Whitsett to be "very lucid" and that this was surprising to him based upon his level of intoxication: "He answered and walked fine.  He talked fine.  His walk might have been somewhat deliberate, but he wasn't staggering as at that level I would expect it out of some people.  Mr. Whitsett in my experience appeared to have a really high tolerance with his level of intoxication." (Tr. at 54).

It is these facts which form the basis of the defendant's motion to suppress to which the court turns its attention presently.

## Discussion

The Fourth Amendment protects "against unreasonable searches and seizures."  U.S. Const. Amend. IV.  The amendment does not prevent all encounters between the police and citizens. It comes into play only when a police officer uses physical force or a show of authority to restrain the liberty of a citizen. *United States v. Odum*, 72 F.3d 1279 (7th Cir.1995); *see also United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990) (recognizing three categories of police-citizen encounters: arrest, an investigatory stop, and voluntary encounter with law enforcement).

The key questions presented by this case are two-fold: first, there is the initial question of whether the patdown search of Whitsett was authorized under the Fourth Amendment at all; and second, once authorized, did  the scope of the search exceed what is permissible under the  Fourth

6

Amendment. These are critical questions for if the search violated the Fourth Amendment, the defense contends, that evidence retrieved from the vehicle as a direct consequence of evidence found during an illegal search, and which, in turn, led to Whitsett's arrest must be suppressed as fruit of the poisonous tree. *See Wong Sun v. United States*, 371 U.S. 471, 484 (1963).[3] This is true in spite the Government's contention that Whitsett, as a mere occupant of the vehicle, lacks standing to contest the subsequent search of the vehicle.  See *Joshua v. DeWitt,* 341 F.3d 430, 450 (6th Cir. 2003) (" Because we conclude the detention to be unreasonable under the Fourth Amendment, Petitioner has standing to challenge any evidence obtained from that detention as fruit of the poisonous tree."); *United States v. McKneely,* 6 F.3d 1447, 1450 (10th Cir.1993) (when a defendant lacks standing to challenge the search of the vehicle, the evidence might still be subject to exclusion as fruit of the defendant's unlawful detention).   So too, would the drugs seized incident to the arrest and Whitsett's statements to the police after his arrest be suppressed.  But, for now, these arguments put the cart before the horse.

It is crucial to begin with what is absent from this record.  Neither the Government's witnesses nor counsel for the Government has alleged that probable cause existed to arrest Whitsett from the

---

[3]*Wong Sun* articulated the following with respect to whether evidence seized is fruit of the poisonous tree:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

*Wong Sun,* 371 U.S. at 487-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal quotation marks and citation omitted). Here, it is clear that if the patdown that resulted in the recovery of ammunition was unlawful, the weapon retrieved from the vehicle as a direct result of the unlawful search would likewise be subject to suppression.

outset of the stop.[4]  Indeed, all the parties have presumed the absence of probable cause and proceeded to discuss this case as a typical stop pursuant to *Terry v. Ohio,* 392 U.S.1, 26(1968).  It is also clear that the officers had reasonable suspicion under *Terry* justifying the stop of the vehicle[5] and detention of Whitsett; Whitsett does not contend otherwise.  The police received a call from the vehicle's driver indicating that Whitsett was refusing to exit her vehicle.  When Officer Jester arrived on the scene, the driver restated that Whitsett was refusing to exit her vehicle despite her wishes that he do so.  At that point, Officer Jester had reasonable justification pursuant to *Terry* to remove Whitsett from the vehicle and detain him at the back of the vehicle until he could ascertain more facts.

But, just because there was sufficient suspicion to justify the stop does not *ipso facto* justify the patdown.  A reasonable suspicion justifying a stop and inquiry by the police will not invariably justify a protective search for weapons.  Rather, there must be independent justification in the form of a reasonable suspicion that the person being confronted is "armed and presently dangerous to the officer or to others." *Terry*, 392 U.S. at 24.  *Terry* leaves no doubt that "to justify a warrantless pat-down search without probable cause, the officer must also be able to point to specific and articulable facts indicating that the individual may be armed and present a risk of harm to the officer or to others." *United States v. Brown,* 188 F.3d 860, 864 (7th Cir. 1999) (citing *Terry*, 392 U.S. at 26-27).  Thus,

---

[4]Although the Government has not argued it, there may very well have been probable cause to arrest Whitsett for public intoxication once Officer Jester smelled alcohol and learned that Whitsett was refusing to leave the vehicle.  The existence of probable cause vitiates the need for a discussion of whether the patdown was warranted or proper in scope. *See United States v. Jackson*, 377 F.3d 715 (7th Cir. 2004)(where officer had probable cause to believe offense had been committed, the fact that Officer told defendant that he was not "under arrest" at the time he was handcuffed, is irrelevant because analysis under the fourth amendment is objective).

[5]Whether it is factually correct to state that Officer Jester conducted a "stop" of the vehicle is a matter of semantics.  The vehicle's driver, after contacting the police, voluntarily waited for police to respond to her call at the intersection so no formal "stop" occurred.  The better description is that Officer Jester "detained" the vehicle and its occupants.

under *Terry*, an officer conducting a *Terry* stop may conduct a protective search of the suspect for the purpose of "the discovery of weapons which might be used to harm the officer or others nearby." *Terry,* 392 U.S. at 26, 88 S.Ct. 1868.

The determination of precisely when a law enforcement official's actions exceed the authority granted to him by *Terry*, is not always an easy one.  As the Second Circuit pointed out in *United States v. Casado,* 303 F.3d 440, 449 (2d Cir.2002), although the line between reasonable and unreasonable police behavior is sometimes fine, and borderline cases will arise in which the classification might seem arbitrary, inevitably a line must be drawn, and occasionally fine distinctions will have "constitutional significance." For this reason,  the decision calls for the refined judgment of the trial court.  In this case, the refined judgment of this court concludes that the patdown search of Whitsett was justified and its scope proper.

Reasonable suspicion is an objective standard; its existence "centers upon the objective significance of the particular facts under all the circumstances." *United States v. Woodrum,* 202 F.3d 1, 7 (1st Cir.2000). That standard is considerably less demanding than the level of proof required to support a finding of probable cause. Here, the objective circumstances, as evidenced by the videotape of the stop, give rise to this less demanding standard.  Officer Jester was told by the driver that Whitsett would not exit her vehicle.  When Officer Jester arrived on the scene, Whitsett was sitting hunched over in the rear passenger seat of the already stopped  vehicle.  Officer Jester testified that his hands were not visible and that when Whitsett stepped from the car, he attempted to slide his hands into his pockets. Officer Jester also smelled a strong odor of alcohol coming from Whitsett.  Although there are some objective facts weighing against a conclusion of reasonable suspicion (Whitsett complied with all of Officer Jester's requests and permitted himself to be handcuffed without

9

incident), the court concludes that there were sufficient objective facts for Officer Jester to have some suspicion that Whitsett might be dangerous.  After all, the stop occurred at 2:00 a.m., Officer Jester was the lone responding officer, Whitsett was hunched over in the car, refusing to get out of the driver's car when asked, wreaked of alcohol and he appeared to be hiding his hands from Officer Jester.  Under these circumstances, Officer Jester had sufficient suspicion to warrant a patdown of Whitsett's person.     In concluding as the court has, it is not unaware that a confrontation between a police officer and a citizen  can be fraught with danger, *see Michigan v. Long,* 463 U.S. 1032, 1047-48 & n. 13, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983); *Pennsylvania v. Mimms,* 434 U.S. 106, 110, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977).  But,  this fact alone does not justify a pat-down, and the case law does not support the view that "an officer may frisk the occupants of any car stopped for a traffic violation." *Id.* at 110 n. 5, 98 S.Ct. 330.  Rather, there must be articulable objective facts which justify the search and here, as we have already concluded, those facts were present in this case.[6]

This said, the scope of the patdown is more troublesome.  In *Minnesota v. Dickerson,* 508 U.S. 366, 377 (1993), the Supreme Court concluded that a police officer may seize contraband detected by sense of touch during a protective patdown search so long as the officer is acting within the bounds of *Terry* at the moment when probable cause arises to believe that contraband is present:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

---

[6]Had the police merely waited a few moments, they would no doubt have had reasonable suspicion to conduct the search. Officer Jester learned from his records check that Whitsett had some previous involvement with the Fort Wayne Police Department and a felony record for cocaine and firearms violations.  This, combined with the other objective facts, would have easily justified the search of Whitsett's person and the recovery of the bullets.

10

*Id.* at 375-76, 113 S.Ct. at 2136-37. Conversely, an officer oversteps the line if the search for contraband continues *after* the officer realizes that no weapons are present; even if probable cause to believe that contraband is present arises thereafter, the seizure would be unlawful. The Court in *Dickerson* found that the search was unlawful because the officer continued to squeeze and manipulate the contents of the suspect's pocket after having established that it contained no weapon. *Id.* at 378, 113 S.Ct. at 2137.

Here, the videotape, consistent with the testimony of Officer Wood, shows him briefly squeezing and, in his words "crushing," the outer pockets of Whitsett's jacket. In at least one instance, however, it appears that he is placing his hands directly in the left jacket pocket without so much as a pat of the outer pocket. The videotape is not altogether clear on this point and Officer Woods' body is blocking the camera's lens. To the extent this is what occurred, this is disconcerting and appears violative of the rules set forth in *Dickerson*. But, it is not that intrusion that recovered the ammunition or about which the defendant complains. It is the search of the right pants pocket which uncovered the ammunition to which the defendant objects. And, in the pocket where the ammunition was located, Officer Woods testified consistently and credibly that he felt a round circular object in Whitsett's pants pocket and that he "believed it was a bullet at that time." (Tr. at 72). The videotape clearly shows him squeezing and feeling the contour of the item to determine from "plain feel" what the object is. Only then does he place his hands inside Whitsett's right pants pocket to retrieve the item. Giving him the benefit of any doubts the court may have, the act of removing the bullet from Whitsett's pocket after already believing it was a bullet does not violate the mandates of *Dickerson* or *Terry*.

11

This case is nearly on all fours with *United States v. Ramirez*, 2003 WL 260572 (S.D.N.Y. February 5, 2003). There, the defendant questioned whether an officer's use of the "pat and squeeze" technique to ascertain that a round object in the defendant's pocket was a bullet violated *Dickerson*. In concluding that it did not, the court credited the testimony of the officer and stated:

> No doubt a metaphysician could draw distinctions between 'immediately' knowing something, knowing it after a 'second or two,' being 90% certain of something after running one's fingers across it, and knowing for certain after squeezing it. But such distinctions would serve little purpose here. What the officer testified to, and what the Court believes, is that, ...the officer here felt the outside of the pocket, using the 'pat and slight squeeze' method to identify the size and shape of objects that might be weapons, and felt an object that he immediately recognized as a bullet by its size and shape, squeezing it or rolling it only for a second or so to verify what he understood from the first. This is quite distinguishable from an extended effort to manipulate, palpate, and ponder an object in order to determine whether it was likely to be a package of narcotics – an item that lacks the distinctive shape, size, and mass of a round of ammunition.

*Ramirez*, 2003 WL 260572 at *7.

The same rationale is applicable here. The videotape confirms the testimony of Officer Woods that he engaged in a brief and confined tactile exploration of Whitsett's outer pants pocket before retrieving the bullet from Whitsett's pocket. Defense counsel believes Officer Woods manipulation of the pocket lasted too long and that once it was clear that the object was not a weapon, the officer had to move on. There is some logic to this argument since a bullet is not always contraband; but, its discovery suggests the presence of a gun elsewhere which is, after all, the objective of the patdown – to find weapons that a suspect might reach if he tries. It would be counterintuitive to suggest that because an officer believed an object detected by plain feel was a bullet rather than the gun itself, he has no authority to remove it to ensure his own safety in the event the stop went awry and the suspect had access to the gun. In short, then, the court concludes that Officer Woods recovery of the

12

ammunition from Whitsett's pocket was within the bounds set forth by *Dickerson* and did not violate the Fourth Amendment.  *See United States v. Rogers*, 129 F.3d 76, 80 (2d Cir. 1997) (valid patdown where officer grabbed an object in the defendant's pocket and manipulated it for a few seconds before concluding it was "probably drugs").

Because Officer Woods legally recovered the ammunition, the gun, which was found in plain view inside the vehicle and alternatively, could have been found pursuant to a protective sweep of the passenger compartment where Whitsett had been seated, see *Michigan,* 463 U.S. 1032, was properly recovered.  Likewise, the search of Whitsett's person at the jail incident to his arrest which uncovered the drugs and more ammunition was valid.

This leaves the statements made by the defendant to Officer Lewis.  The parties spend significant time discussing whether Whitsett was capable of waiving his Miranda rights given his level of intoxication at the time his rights were read to him.  Such an analysis is unnecessary given the undisputed credible testimony of Officer Lewis that Whitsett volunteered all of the information to him after the drugs and the ammunition were found.  Volunteered statements are not barred by the Fifth Amendment. *Miranda*, 384 U.S. at 478.("any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."). Moreover, the defendant's intoxication does not, by itself, negate the voluntary nature of his statements.  *See United States v. Toro*, 359 F.3d 879, 985 (7th Cir. 2004); *United States v. Chrismon,* 965 F.2d 1465, 1469 (7th Cir.1992) (stating that "a defendant's intoxication ...--without some showing of coercion by the government--will not negate voluntariness"). Rather, "a diminished mental state is only relevant to the voluntariness inquiry if it made mental or physical coercion by the police more effective." *Id*.  Here, there is no evidence of any compelling influence or the exercise of any mental or physical coercion on the part of law enforcement

13

to suggest that the statements Whitsett made were involuntary. Accordingly, the defendant's request to suppress his statements made to police after he arrived at the jail is DENIED.

## Conclusion

Based on the foregoing, Defendant's Motion to Suppress Evidence is DENIED.

Entered: This 9th day of December, 2005

s/ William C. Lee, Judge
United States District Court
Northern District of Indiana
